IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHRISTOPHER J. REDMOND, | ) | |
| Trustee of the Bankruptcy Estate of | ) | |
| Ashraf Fouad Hassan and Irina Hassan, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:12-CV-02645-OS |
| | ) | |
| ASHRAF FOUAD HASSAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

I.  BACKGROUND

A.  Procedural History

This is an adversary proceeding arising from the Chapter 7 bankruptcy filed by
Debtors Ashraf Hassan and his wife, Irina Hassan.  The suit was originally brought by
the Trustee and Kansas Express International, Inc. ("Kansas Express"), but at trial the
Court inquired whether the corporation was a proper plaintiff.  After trial, Plaintiffs filed a
Supplemental Trial Brief confirming that Kansas Express is no longer a party in interest
and the Trustee is the sole Plaintiff in this matter.

Ashraf Hassan ("Hassan") is a defendant, but Irina Hassan is not.  The other
individual defendants named in the Amended Complaint are: Bilal Said, Mark Murphy,
Al Moser ("Moser") and Diane Moser.  The following entities are also named as
defendants:

- International Football Club, Inc. ("IFC")
- Overland Park Sports Complex, LLC
- Terra Sports Group
- Terra Venture, Inc.
- Terra Venture Investments, LLC
- Analytical Management Laboratories, Inc.

- The Murphy Law Firm
- Final Touch, Inc.
- Kansas City Limousine, Inc.
- Budget Limousine, Inc.

The first six entities are referred to collectively as "the Said Companies."

Moser and his wife settled the claims asserted against them, and the settlement was approved in April 2007. This settlement also encompassed the claims against Final Touch, Kansas City Limousine, and Budget Limousine. Murphy and The Murphy Law Firm also settled the claims asserted against them; the settlement was approved in August of this year.

Said was represented by counsel and defended the claims against him until counsel was permitted to withdraw in February 2008. Counsel for the Said Companies also withdrew. Thereafter, Said's participation stopped. The Said Companies could not represent themselves because they were corporations and LLCs. While Said may have been technically representing himself at this time, he did not fulfill his obligation of advising the Court where he could be contacted. The Record reflects that the parties mailed some of their filings to an address purportedly belonging to Said, but Said never provided the Court with an address for the mailing of Court orders. A pretrial conference was held in May 2012, but Said did not appear. See Order dated September 9, 2012. A second pretrial conference was held in April 2014; the Order setting the conference stated that attendance was mandatory for all parties and that failure to appear would "result in the striking of that party's pleadings and, in the case of any non-appearing defendant, the entry of default." Order dated April 3, 2014. Still lacking Said's address, the Clerk of Court could not mail a copy of the April 3 Order to Said. Nonetheless, the Trustee delivered a copy to Said via Federal Express. Said did not appear at the pretrial conference, and on April 28 the Court issued a written Order (not a text entry, as has been intimated) finding Said and the Said Companies to be in default. That same Order declared that the issue of damages was intertwined with the Trustee's claims against Hassan, so a final judgment would be deferred until after trial. Again, the Clerk of Court could not send this Order to Said.

In early August, Said re-retained the attorney who had previously represented him.  Counsel entered his appearance on August 29, and filed a Motion for Reconsideration of the Entry of Default at approximately 3:30 p.m. on the day before trial.  However, when presented documentation that the Trustee delivered the April 3, 2014 Order to Said via Federal Express, counsel moved in open court for leave to withdraw the Motion for Reconsideration.  This requested was granted; thus, Said remains in default and he is deemed to have admitted the Amended Complaint's factual allegations.

Counsel did not re-enter an appearance on behalf of the Said Companies.  The Said Companies also remain in default and are deemed to have admitted the Amended Complaint's allegations.

Hassan was represented by counsel when the bankruptcy was filed, and later by different counsel in this adversary proceeding.  However, at some point counsel was permitted leave to withdraw and Hassan began representing himself in this matter.  A bench trial was held on September 10 and September 12 of this year so evidence could be presented on the claims against Hassan and to establish the damages as to Said and the Said Companies.

## B.  Factual Findings

In addition to testimony and other evidence offered at trial, the Trustee submitted testimony from three witnesses via depositions.  Hassan testified, as did Said.  The Court has considered all of the evidence presented.  All findings with respect to Hassan are supported by the preponderance of the evidence.  Some findings involving Said are based on the admissions he is deemed to have made by virtue of his default, while other facts involving Said (particularly those related to damages) are supported by the preponderance of the evidence offered at trial.  The Court's discussion will specify facts that have been deemed to have been admitted by virtue of the defaults.  The Court will occasionally cite to the depositions submitted but generally will not parse out each witness's testimony in resolving the disputes; it should be presumed the Court has considered all of the evidence and resolved any conflicts in the manner set forth below.

As a prelude, however, the Court declares it found very little of Hassan's or Said's testimony to be worthy of belief.

### 1.  Hassan's Bankruptcy and Sale of His Business

Hassan operated a limousine and taxi service that has been referred to at various times as Kansas Express, Kansas Express, Inc., Kansas Express International, Inc., Kansas International, Inc., and Black Tie Limousine.  Kansas Express and Black Tie Limousine appear to have been fictitious names for the corporations.  Regardless, the corporations under which Hassan operated never issued stock and did not follow corporate formalities; all were forfeited for failing to file annual reports.  Hassan started his business in approximately 1999, but began experiencing difficulty in and after 2002.  In April 2003 he contacted American Business Masters ("ABM") to help locate a buyer for the business.  According to the listing agreement with ABM, a selling price of $800,000 was settled upon but the Record is not clear whether Hassan or ABM suggested this price.  Hassan testified it was ABM, but the Court is not convinced this is true – but even if ABM suggested the $800,000 figure, it did so based on financial information Hassan provided, which did not include information demonstrating that the business was experiencing a downturn.  In fact, the financial information Hassan supplied not only reflected that the business was profitable, but it also reflected net assets (excluding goodwill) of over $322,000.  Included in the goodwill (which was described as "PRICELESS" and thus incapable of being added to the $322,000) was the business's customer list of "[o]ver 2,000 repeat clients."  Ultimately, it does not matter who suggested the price: the salient points are that (1) in April 2003 Hassan was trying to sell the business for $800,000 and (2) he represented the business had substantial assets, including a very respectable customer list.  However, nobody wanted to buy the business for that price.

Hassan and his wife filed for bankruptcy under Chapter 7 of the Bankruptcy Code on or about February 3, 2004.  They did this with the assistance of an attorney, Kenneth Gay.  Among the filings in connection with the bankruptcy was a Schedule B, listing the couple's personal property.  Under the category for "[s]tock and interest in incorporated

and unincorporated businesses," the Hassans' Schedule B lists stock in Kansas International, Inc. and assigns a value of zero dollars.  The value was derived after a conversation Gay had with Hassan, and was based on information supplied by Hassan.  However, had Gay seen the information Hassan supplied to Broadmoor Capital (which will be discussed shortly), he would have had further discussions about the matter with Hassan and likely would have amended Schedule B to reflect a higher value.  Gay Dep. at 43.

The Trustee attempted to gather more information about the business in order to confirm the valuation of zero and to determine if the business had any assets.  The Trustee posed questions about the business during the 341 meeting (held in late February 2004), and Hassan indicated that the business had no value, was not operating, and had no assets.  These representations were not true: Hassan was still operating the business, Hassan Dep. at 33-40, and as will be discussed he also believed the business had value.  Nonetheless, his omissions and false representations persuaded the Trustee that the stock (and, hence, the business) had no value and that no further action was justified at that time.

Hassan did not reveal to the Trustee his pre-filing attempts to sell the business for hundreds of thousands of dollars – actions that demonstrate Hassan's belief the business had some value.  Hassan did not reveal the financial information he provided to ABM.  And, he did not amend his Schedule B or otherwise reveal his other pre- and post-discharge efforts to sell the business.

The Bankruptcy Court entered a discharge on May 18, 2004.  Earlier that month Hassan approached Moser about buying the business for $550,000.  Hassan related that he was "desperate to sell" because he was trying to raise money to fund development of a soccer complex.  Moser's interest in buying the business intensified after Hassan represented the limousine business netted twelve to fifteen thousand dollars per month.

Hassan then contacted Steve Lord, who at that time was the COO of Broadmoor Capital, Inc. ("Broadmoor").  Hassan told Lord that he had a friend interested in buying Kansas Express and asked Lord and Broadmoor to facilitate the sale.  Broadmoor's role was to house the documents related to the sale, make them available for Moser's

review, and facilitate the exchange of documents and information between Moser and Hassan.  Hassan provided financial information to Lord for this purpose.  Neither Lord nor Broadmoor evaluated the financial data, conducted an independent investigation, or provided any information to Moser that was not initially provided by Hassan; Broadmoor acted only as a conduit for Hassan's information and a place to store materials. Included in the information Hassan supplied to Broadmoor (which was then provided to Moser) were revenue and income statements for 2003 and the first four months of 2004. This information revealed that in 2003 the business earned revenue of nearly $616,000 and had an adjusted net profit of over $186,000.  The figures for the first four months of 2004 were comparable to those from the first four months of 2003.  All of these figures were consistent with Hassan's representation to Moser that the business netted $12,000 to $15,000 monthly.  Hassan also arranged for Moser to receive a copy of the Asset List attached to the Listing Agreement with ABM (which was described on page 4, above).

        Despite not providing any advice to Moser or Hassan about the transaction, Lord suggested to them that an attorney he knew – Murphy – might help them prepare the sale documents.  At the initial meeting with Murphy, Hassan revealed that the corporation was in default.  Murphy indicated he could alleviate this problem and recommended that the parties construct the transaction as a sale of the company's stock.  To that end Murphy prepared a Stock Purchase Agreement, which represented that Hassan owned all of the stock in Kansas Express International, Inc. and expressed the parties' agreement that Hassan would sell all of the stock to Moser for $550,000. Hassan also agreed to a covenant not to compete.  The Stock Purchase Agreement represents a series of attached exhibits set forth the company's assets, liens, and contracts are attached (although those exhibits are not included with Exhibit 28).  These and other provisions make clear that the parties intended for Kansas Express's stock to be transferred from Hassan to Moser.

        Half of the sale price was to be paid in cash, and half of this amount was to be paid with a promissory note from Moser to Hassan.  The Stock Purchase Agreement was signed by Hassan and the Mosers on or about May 28, 2004, and the closing date was set for July 1.  By June 28, Moser had paid Hassan $129,420.

6

Moser learned of Hassan's bankruptcy between June 28 and the closing date, and brought the matter to Murphy's attention. Murphy suggested that the problems posed by Hassan's bankruptcy could be avoided if the transaction was re-characterized as a sale of services instead of a sale of the business or a sale of assets. To that end he prepared a new "Agreement" (which was backdated to May 28 even though it was signed on or about July 6) wherein Hassan agreed to provide his services to Moser's limousine company for one year in exchange for $300,000 plus incentive payments based on the performance of Moser's new limousine company. Like the Stock Purchase Agreement, the Agreement included a covenant not to compete; unlike the Stock Purchase Agreement, the Agreement specified that $50,000 of the sale price was attributable to the covenant. Despite purporting to be a services agreement, the Agreement contains many provisions one would expect to see only in a contract for the sale of a business or its assets. For instance, the Agreement

- Provides that all car leases will be assigned to Moser's company,
- Requires Hassan to provide Moser with access to all of Kansas Express's "plants, properties, books, and records" to Moser so that he can "make such investigation" as Moser deems necessary, "provided that such investigation shall not unreasonably interfere with the operations of Kansas Express,"
- Makes representations about Kansas Express's corporate status, finances, assets and obligations, and Hassan's ownership of Kansas Express's stock, and
- Prohibits Kansas Express from incurring additional liabilities or selling any assets.

At closing, Moser paid Hassan $171,000, bringing Moser's total payments to $300,420.[1]

Moser testified the Agreement was just a reformulation of the parties' agreement that did not change its substance; the parties' intent remained to transfer the assets of Hassan's limousine business to Moser. Hassan does not deny this fact. Indeed, Hassan's and Moser's subsequent actions confirm their shared understanding that Hassan was selling the business to Moser. However, by the end of July Moser came to

---

[1]The agreed purchase price was $300,000, but Moser and Hassan seemed to have overlooked the extra $420 at the time.

understand Kansas Express's operations and finances were not as Hassan had described, and he attempted to rescind the deal.  Moser returned the office keys, did not pursue the assignments of property interests Kansas Express was obligated to make, and walked away.  Hassan refused to return any of Moser's money.

Shortly thereafter, Hassan met with Murphy to discuss his options.  Murphy thought it prudent to consult an attorney with greater expertise in bankruptcy, and to that end consulted with Judge Cynthia Norton.[2]  Murphy contacted Judge Norton on July 26[3] and told her he had a client who had a bankruptcy issue involving the sale of his business's assets.  Murphy revealed that the transaction was completed as the sale of assets and then "restructured as something else because the seller was in bankruptcy."  Norton Dep. at 14, see also Norton Dep. at 29.  She expressed doubt that the maneuver would work but agreed to talk to Murphy's client.  Shortly thereafter, Hassan called Judge Norton and described the sequence of events, including execution of the Stock Purchase Agreement and the transaction's re-characterization to make it appear to be a contract for services and not a sale of assets.  Judge Norton adhered to her initial belief that this attempt to avoid the bankruptcy laws was unlikely to succeed and told Hassan he needed to discuss the transaction's details with his bankruptcy attorney.

Hassan followed Judge Norton's advice – but only to a point.  He saw Gay later that day and revealed the Agreement.  He explained that Murphy had prepared and designed the Agreement to be a contract for services so that it would not appear to be a sale of the business's assets.   However, he did not reveal the transaction's entire history generally or the Stock Purchase Agreement specifically.  Gay sent the

---

[2]At the time of the events in question, Judge Norton was known as Cynthia Grimes.  By the time of her deposition she had married and identified herself as Cynthia Grimes Norton.  Norton Dep. at 5.  Still later, she was appointed to be a bankruptcy judge in the Western District of Missouri.  For ease of discussion, the Court will refer to her as "Judge Norton" as that is her current name and title.

[3]This was the only communication between Judge Norton and Murphy regarding Hassan.  Other witnesses have surmised that Murphy communicated with Judge Norton in late June or early July after Moser initially raised concerns about Hassan's bankruptcy, but even those witnesses admit they were not involved in any such conversations.  Regardless, the Court credits Judge Norton's testimony that her only conversation with Murphy about this matter occurred on July 26, 2004.

Agreement to the Trustee, along with a letter setting forth his client's position that the Agreement reflected "an agreement not to compete and to provide consultation to" Moser and Moser's company.  Gay would not have written this letter if he had known about the Stock Purchase Agreement; upon being presented with it during his deposition, Gay believed the Stock Purchase Agreement clearly reflected that the transaction was really for the sale of property belonging to the bankruptcy estate.

The Trustee reviewed the Agreement and concluded that despite the large amount of money being paid to Hassan the payment appeared to be for Hassan's services so the money did not constitute property of the estate.  Meanwhile, Moser had contacted the Johnson County District Attorney to complain about what he believed to be Hassan's fraudulent conduct.  An investigation was initiated, and in early 2005 an investigator met with the Trustee.  The investigator presented a copy of the Stock Purchase Agreement to the Trustee; this represents the first time the Trustee saw the Stock Purchase Agreement.

## 2.  Disposition of the Proceeds

As stated earlier, Hassan told Moser he was trying to sell the business because he was trying to raise money to fund development of a soccer complex.  Hassan and Said had discussed this idea and had begun putting plans in place.  As part of those plans, in 2003 they formed International Football Club, Inc. ("IFC").   The Articles of Incorporation list Hassan and Said as the directors.  In addition, in December 2003 IFC entered an agreement with Broadmoor whereby Broadmoor was to provide consulting and capital-raising services.  Said signed the agreement as President of IFC and Overland Park Soccer Club, LLC (another entity involved in the soccer complex project); Hassan signed as Co-President of IFC.[4]

Said testified IFC was just a marketing company, but it was clearly more than that: it had a contract to buy property from Ed and Norma Ross that was intended as the

---

[4]The Court does not believe Said's testimony that the contract was altered after it was signed and instead credits Lord's testimony that the contract was not altered.

site for the future soccer complex.  The contract required IFC to obtain certain permits
and approvals within a certain amount of time and permitted IFC to pay to extend that
time.  The net effect is that IFC had a renewable option to buy the land.  It may have
been Said's (or others') plan to eventually have other, separate corporations own the
complex, operate the complex, market the complex, etc., but this point is not important
to the present proceeding.

Said also testified that he was the sole owner of IFC and Hassan was just a
business manager.  This may be true in regard to the entity known as IFC, but it
understates Hassan's role with respect to the entire "soccer complex" plan.  Certainly,
Said was encouraging or pressuring Hassan to provide his own capital to the effort.
This conclusion is supported by Hassan's statements to Moser and Lord as to why he
was selling the limousine business.  This conclusion is also supported by Hassan's
payments on IFC's behalf, which are discussed below, and portions of Said's testimony
wherein he revealed that he was encouraging Hassan to contribute money to the
project.

Hassan deposited all of the payments from Moser – totaling $300,420 – in the
Kansas Express account even though the payments were intended to purchase the
company.  The Trustee has directed the Court to the following checks written by
Hassan:

| | | |
|---|---|---|
| Check 7584 | Broadmoor Capital | $20,000.00 |
| Check 7585 | Broadmoor Capital | $20,000.00 |

These two checks were referred to in various ways and described differently at
various times.  In particular, Exhibit 74 – a summary exhibit submitted by the Trustee –
(1) describes what is really Check 7585 as Check 75844 and (2) describes what is
really Check 7584 as Check 7585.  The Court finds these checks were both written on
May 28, 2004.  The memo for Check 7584 indicates it is a payment of half of a sum due
leaving a balance of $20,000; the memo for Check 7585 indicates it is a payment for
half of a sum due leaving a balance of zero.  Both checks were presented for payment;
Check 7585 was presented first, was honored by the bank on June 2, and is reflected in
the bank statement closing on June 30, 2004 (Exhibit 16).  Check 7584 was presented

second, was not initially honored due to insufficient funds, was finally honored on July 7, and is reflected in the bank statement closing on July 31, 2004 (Exhibit 17).

The facts demonstrate the $40,000 was payment for a single debt. The question then becomes: what debt? The only testimony available to the Court is from the Trustee, who indicates it was payment for services related to the sale of the limousine business. The Court credits this testimony. There is no evidence indicating this payment was for services Broadmoor provided to IFC.

Check 7586          Superior Chevrolet          $26,970.02

This payment was for a Hummer for Hassan's personal use.

Check 7588          Bill Said          $10,000.00

Said and Hassan testified this was payment for a loan Said made to Hassan in late 2003, before Hassan filed for bankruptcy. The Court rejects this testimony (as well as the notation on the check's memo line). The Court believes this payment was either (1) a capital contribution to IFC or (2) partial fulfillment of Hassan's prior promise to contribute money to IFC's operations.

The Court also notes that even if the testimony is true it does not aid either Said or Hassan. Hassan could not use bankruptcy assets to fully pay a pre-petition debt (and particularly not a pre-petition debt for which a Proof of Claim had not been filed).

Check 7589          Bill Said          $12,500.00

This check's memo line states it is for "D/P on land (Ed Ross)." The check is dated May 29, 2004 – the day after Hassan and Said executed the agreement on IFC's behalf with Ross for the purchase of Ross's land. That agreement states a payment of $25,000 was due upon execution of the agreement. The Court finds Said paid the entire $25,000 to Ross and this check represents Hassan's repayment of his half.

11

Check 7587[5]          Superior Chevrolet          $30,000.00

This is another payment on Hassan's Hummer.


Check 7592          Ash Hassan          $ 5,000.00

This is simply a payment to Hassan.  There was no evidence indicating what the funds were used for so there is no basis for attributing it to IFC or Said.


After Moser's $171,000 payment at closing, Hassan wrote the following checks to which the Trustee directs the Court's attention:


Check 7693          Ash Hassan          $ 1,250.00

This is another payment to Hassan.  There was no evidence indicating what the funds were used for, thus there is no basis for attributing it to IFC or Said.


Check 7692          Polsinelli, Shalton & Welte          $ 5,000.00

Polsinelli is a law firm that performed work for IFC.  The Court finds this was a payment of a debt owed by IFC or a contribution to the retainer on IFC's behalf.


Check 7699          Spradley & Riesmeyer          $ 5,000.00

This is a check to a law firm retained by Hassan to represent him in matters related to his bankruptcy.[6]


Check 7697          Cash          $ 2,500.00

This check is self-explanatory.  There was no evidence indicating what the funds were used for, thus there is no basis for attributing it to IFC or Said.

---

[5]Exhibit 74 mistakenly refers to this as Check 7687.

[6]The check, which is included as part of Exhibit 18, is actually made out to "Spardty & Riesmeyer."  The Court takes judicial notice of the intended payee's correct name.

Check 7703          Ed Ross                          $15,000.00

The memo on this check says (in all capital letters) "for land ($7500.00 Ash & $7500.00 for Bill)."  Said testified he gave Hassan $7,500.00 and told him to combine it with $7,500.00 of his own money and pay the entire $15,000 to Ross.  The Court does not find Said to be credible on this point.  The Court finds the $15,000.00 payment was made entirely by Hassan for IFC's benefit.  The Court further finds this payment was made at Said's insistence; by this time Said had contributed significantly more money to the soccer project and insisted that Hassan start making up the deficit.  Thus, Hassan made this payment from his own funds and Said did not contribute funds for this payment.

The payments described above account for $153,220.02 of the $300,420 Moser paid.  The Court notes Hassan wrote Check 7694 to himself on July 16, 2004, in the amount of $92,003.00; the memo line states it is "For Land."  There was no testimony about a transaction related to this check, but it clearly demonstrates the money went to Hassan for some purpose.  The Court has not carefully scrutinized the remaining checks; they appear to potentially be for Kansas Express's operating expenses, but some could also be for Hassan's personal purposes.  No other checks appear to be related to IFC, the other Said Companies, or Said.

### 3.  Facts Relating Specifically to Said and the Said Companies

Some facts relevant to the claims against Said have been established by virtue of his default.  However, facts relating to damages remained to be decided based on the evidence presented at trial.  One of the significant factual issues related to damages is: when did Said learn of Hassan's bankruptcy?

Said first learned of Hassan's bankruptcy by July 16, 2004.  Amended Complaint, ¶ 58.  This fact has been deemed admitted, and Said's testimony to the contrary must be rejected.  However, the Court must ascertain whether Said learned of Hassan's bankruptcy before that date.  Lord learned of the bankruptcy on July 2 and wrote a letter to Said (and a letter to Larry Winn, IFC's attorney at Polsinelli) on July 8 advising Hassan had filed bankruptcy "that included personal and business assets" and raising

13

the question of whether this affected IFC.  The Court thus finds Said first learned about Hassan's bankruptcy and its possible inclusion of his business assets between July 8 and July 16, 2004.  There is no need to identify the date with greater precision.[7]

The Court also finds that Said knew Hassan was trying to sell his business; in fact, Hassan had tried to entice Said into buying it around the same time he listed it with ABM and again around the time he offered it to Moser.  Said also knew about the sale to Moser.  These facts did not justify any alarm for Said until they were coupled with knowledge of Hassan's bankruptcy.

Said testified he was the sole owner of IFC.   This fact becomes particularly critical when combined with other facts that are deemed to be true in light of Said's default.  IFC did not observe corporate formalities and was insolvent.  Amended Complaint, ¶¶ 60(a)-(b), 93-94.  The Said Companies commingled their assets. Amended Complaint, ¶¶ 60(e), 98.  The Said Companies also did not maintain separate existences from each other or from Said, and the Said Companies were merely alter egos for Said and his personal operations.  Amended Complaint, ¶¶ 60(d), 60(f)-(g), 96-97, 99.  Said is also deemed to have agreed that adhering to the separate corporate existences for these entities "would sanction fraud and promote injustice or inequitable consequences for the Bankruptcy Estate."  Amended Complaint, ¶¶ 60(h), 100.

## II.  DISCUSSION[8]

The Court concludes Hassan's limousine business was property of the bankruptcy estate.  This conclusion was established in the Bankruptcy Court's Order Granting in Part Plaintiff's Trustee's Motion for Partial Summary Judgment, issued on December 17, 2007 by the Honorable Dale L. Somers, United States Bankruptcy Judge

---

[7]The Court tends to believe Said knew much earlier than July 8, but this fact is not established by the preponderance of the evidence.  Countering the Court's disbelief of Said is the Court's stronger belief that Hassan was purposely keeping his bankruptcy as secret as possible.  The greater weight of the evidence does not establish that Said was a member of Hassan's inner circle of confidantes – the Court merely suspects it.

[8]The Discussion portion includes additional factual determinations.  It should be understood that all such findings are based on the preponderance of the evidence.

for the District of Kansas.  The undersigned has reviewed Judge Somers' Order *de novo* and agrees with its reasoning.  In summary, with exceptions not relevant here, all of a debtor's legal and equitable interests in property belong to the bankruptcy estate; in this case, that would include the limousine company's stock.  11 U.S.C. § 541(a)(1).  Moreover, the bankruptcy estate includes proceeds, profits, and products of property belonging to the estate, so any payments received in exchange for property of the estate automatically belong to the estate.  Id. § 541(a)(6).

The Court also concludes that the entire $300,420 paid by Moser was for the business and thus became estate property.  As noted in Judge Somers's Order, the initial $129,420 was paid pursuant to the Stock Purchase Agreement in contemplation of Moser's receipt of the Kansas Express's assets – including the furnishings, the office and other leases, the cars, the office equipment and, critically, the customer list.  It may be that the assets were not as Hassan represented them to be; nonetheless, Moser paid $129,420 toward the full purchase price for those assets and Hassan accepted $129,420 as partial payment toward the full purchase price.  Moser intended to receive all the assets from Hassan, and Hassan intended to convey all the assets to Moser.

The parties' intent was not changed by execution of the Agreement and the attempted re-characterization of the transaction as one for services and not assets.  The Agreement was a thinly disguised subterfuge designed to obscure the transaction's true nature; the artifice was specifically designed to skirt the bankruptcy laws.

As an initial matter, the $50,000.00 earmarked for Hassan's covenant not to compete is considered a payment for the business's goodwill and, hence, a payment for assets and not services.  The Court will not expand on this conclusion further, and instead adopts Judge Somers's discussion of this issue from his December 17 Order.

The Court concludes the remaining $121,000 Moser paid at closing was also for Kansas Express's assets and not for Hassan's services.  First, the Court finds there was never any real intention that Hassan provide meaningful services.  Second, as described on page 7 of this Order, the Agreement contains numerous provisions that have no purpose in a contract for services.  These provisions evince the parties' continued understanding that their transaction was a sale of assets.  Third, the circumstances occasioning the re-characterization demonstrate the parties' purpose

was not to arrange for Hassan to provide services – the expressed purpose was to avoid running afoul of the bankruptcy laws by re-documenting the exact same transaction to make it look like something it was not.  The Court concludes none of the money paid at closing was intended for Hassan's services.  Thus, the $171,000 Moser paid Hassan at closing was property of the bankruptcy estate.

## A.  Counts I, II, IV and VIII(A)[9]

The Trustee may avoid a transfer of estate property that occurs after the bankruptcy petition is filed unless the transfer is authorized by the Bankruptcy Code or the Court.  11 U.S.C. § 549(a).  No party has suggested Hassan's transfer of Kansas Express to Moser was authorized by the Bankruptcy Code or the Court.  The Court's independent review reveals no basis for believing the sale to Moser was authorized by the Bankruptcy Code or the Court.  Thus, this transfer was avoidable under the Bankruptcy Code.  After the sale, the money received became property of the estate.  Hassan transferred this money as well; once again, there was no authorization from the Court and no authorization under the Bankruptcy Code.

When a transfer is avoided, the Trustee may recover the value of the property from either (1) the initial transferee or (2) any immediate or mediate transferee of the initial transferee.  Id. § 550(a).  Thus, the Trustee may recover from Hassan, Said, and the Said Corporations.  Hassan's liability is easy to determine: he took the entire $300,420, so the Trustee is entitled to judgment against Hassan for the entire $300,420.

IFC received the benefit of $20,000 – the $5,000 paid to Polsinelli for IFC's legal fees and $15,000 paid to Ed Ross to maintain IFC's rights under its contract with the Rosses.  Thus, the Trustee is entitled to judgment against IFC in the amount of $20,000.

All of the Said Companies are in default and are deemed to have admitted that they are all alter egos of each other.  The facts deemed to have been admitted support

---

[9]The Amended Complaint contains two Count VIIIs.  The first, which the Court has referred to here as Count VIII(A), seeks to pierce the corporate veils of the Said Companies.  The second, which the Court will refer to as Count VIII(B), asserts a claim for conversion against all Defendants.

the legal conclusion that their separate corporate (or LLC) existences should be disregarded.  See State ex rel. Graeber v. Marion County Landfill, Inc., 76 P.3d 1000, 1017 (Kan. 2003) (quoting Speer v. Dighton Grain, Inc., 624 P.2d 952 (Kan. 1981)) (setting forth factors to be considered when deciding whether to pierce the corporate veil).  The Trustee is entitled to judgment against each of them to the same extent he is entitled to judgment against IFC.

Finally, Said directly received two payments: the $10,000 from check 7588 and the $12,500 from check 7589.  This totals $22,500.  For the reasons previously expressed the Said Companies (including IFC) are alter egos of Said.  This means Said is also personally responsible for the $20,000 the Trustee can recover from IFC, making Said responsible for a total of $42,500.  In reaching this conclusion, the Court rejects Said's attempt to assert some form of good faith defense, similar to that available to a buyer in due course.  First, Said's pleadings were struck so he has no affirmative defenses.  Second, assuming a "buyer in due course" defense is legally viable (an issue the Court need not address), it would not be available under the facts of this case.  Said gave no value in exchange for the two payments he received directly.  Neither Said nor IFC provided Hassan with anything of value in exchange for the $5,000 paid to Polsinelli on IFC's behalf; moreover, IFC knew about Hassan's bankruptcy because IFC's Co-President and director – Hassan – knew about the bankruptcy.  This same analysis applies to the $15,000 paid to Ross; in addition, by this time Said also knew about Hassan's bankruptcy.

In conclusion: the Court holds the Trustee is entitled to judgment on Counts I, II, IV and VIII(A) in the amount of $300,420, as follows

1. Against Hassan for the entire $300,420

2. Jointly and severally against the Said Companies for $20,000 of the $300,420

3. Jointly and severally against Said for $42,500 of the 300,420.

Pursuant to section 542, the Trustee is also entitled to an Order directing the defendants to account for the estate's property and deliver it to the Trustee.  Defendants do not have any of the estate's property, and the Court is not certain what section 542 provides the Trustee under the circumstances of this case that he cannot achieve by

prevailing under sections 549 and 550.  The Court views the three provisions as acting in concert and entitling the Trustee to judgment as described above.

## B.  Count III

At trial, the Trustee agreed that Count III is no longer an issue in light of Murphy's and the Mosers' settlements.  Accordingly, Count III is dismissed.

## C.  Count VIII(B)

Count VIII(B) asserts a claim of conversion against all Defendants.  Having concluded the $300,420 was property of the estate, there is little doubt that Hassan converted the entire sum.  "Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."  Bomhoff v. Nelnet Loan Services, Inc., 109 P.3d 1241, 1246 (Kan. 2005).  It is regarded as a strict liability tort; "[t]he required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant."  Millennium Fin. Services, LLC v. Thole, 74 P.3d 57, 64 (Kan. Ct. App. 2003) (quotation omitted); see also Nelson v. Hy-Grade Const. & Materials, Inc., 527 P.2d 1059, 1062 (Kan. 1974); In re Bratt, 491 B.R. 572, 579 (Bankr. D. Kan. 2013).  Hassan not only appropriated the limousine business to his own use by purporting to sell it to Moser, but thereafter he appropriated the proceeds of that sale to his own uses.  Thus, Hassan converted both the business and the money obtained for selling the business.

 IFC exercised ownership and control over $20,000 when its Co-President and director – Hassan – used those funds on IFC's behalf to pay IFC's obligations.  The Court's prior ruling makes the other Said Companies and Said himself jointly liable for this amount.

Said is directly liable for the sums paid to him, or $22,500, because he exercised ownership over those sums.  As noted, Said's lack of knowledge of the true owner's

identity does not absolve him of liability.  This makes Said liable for converting a total of $42,500.

### D.  Counts V, VI, and VII

These three counts assert claims for civil conspiracy; the Court declines to formally enter judgment on these counts, and instead will dismiss them.  Unlike a criminal conspiracy, the existence of a civil conspiracy is not an actionable wrong by itself; it is really a means for "impos[ing] vicarious liability for concerted action."  State ex rel. Mays v. Ridenhour, 811 P.2d 1220, 1226 (Kan. 1991); Knight v. Neodesha, Kan., Police Dep't, 620 P.2d 837, 843 (Kan. Ct. App. 1980); see also 15A C.J.S. Conspiracy § 8.  The Kansas Supreme Court has relied on Corpus Juris Secundum (which is why the Court has cited this as legal support) to hold that a civil conspiracy requires "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  Citizens State Bank v. Gilmore, 603 P.2d 604, 613 (Kan. 1979); see also Stoldt v. City of Toronto, 678 P.2d 153, 161 (Kan. 1984).

Count V asserts a civil conspiracy to defraud the bankruptcy estate, and Count VI asserts a civil conspiracy to convert property belonging to the bankruptcy estate.  The sole defendants for these counts are Murphy, IFC, and Hassan.  Murphy has settled. There is no evidence connecting Murphy to IFC.  If there was a conspiracy, IFC was involved only because Hassan was involved, and there is an issue as to whether this means Hassan was effectively conspiring with himself – which does not support the theory.  See Diederich v. Yarnevich, 196 P.3d 411, 419-20 (Kan. Ct. App. 2008); 15A C.J.S. Conspiracy § 9.  Even if Hassan conspired with Murphy, it would not increase Hassan's liability or the damages he caused.  A favorable ruling will not increase the Trustee's recovery, so there is no need to delve into the legal intricacies that must be addressed to resolve these claims.

Count VII asserts a civil conspiracy between Hassan, Said, and the Said Companies "to conceal and disguise from the Trustee the conversion, receipt, use, and disposition of proceeds of the purported" sale of Hassan's limousine business.

Amended Complaint, ¶ 87.  This claim also presents difficulties in establishing who conspired with whom.  There remains the question of whether Hassan can conspire with the Said Companies because that might be the same as him conspiring with himself.  There are similar concerns with respect to Said and the Said Companies because the Said Companies have been held to be alter egos of Said; the law does not permit a conclusion that Said conspired with himself.

There remains the possibility that Hassan and Said conspired with each other, but even if they did it would not increase their liability or the damages owed.  The only damages recoverable are those proximately caused by the conspiracy; co-conspirators are not liable in tort for pre-conspiracy conduct.  15A C.J.S. Conspiracy §§ 46-47; see also Stoldt, 678 P.2d at 161 (describing fifth element as requiring proof of "damages as the proximate result" of the conspiracy).  At best, the damages proximately caused by the conspiracy are those that occurred after Said learned of Hassan's bankruptcy in July 2004 (because that is the earliest the conspiracy could have begun), and after that date the only damages caused would be the $15,000 payment made to Ross.  Said and Hassan are both already liable for this payment by virtue of the Court's prior rulings, so a favorable ruling on Count VII does not provide any real benefit to the Trustee.

For these reasons, the Court discerns no reason to delve into Counts V, VI, and VII.  These three counts are dismissed.

### E.  Count IX

Count IX asks the Court to impose a constructive trust.  A constructive trust is a remedy and not a cause of action.  Nelson v. Nelson, 205 P.3d 715, 723-24 (Kan. 2009).  The remedy is available when a person has obtained or holds title to property that was obtained by wrongful conduct.  Id. at 727.  However, the Trustee identifies no specific assets that should be the subject of a constructive trust.  Hassan, Said, and the Said Companies do not presently have any of the limousine business's assets; if they did, the Court could create a constructive trust and direct that the property be returned to the rightful owner (the bankruptcy estate).  There is also not a specific, identifiable fund of money that can be designated for return to the bankruptcy estate.  There is not

even evidence of any assets the Court can identify as having been purchased with the bankruptcy estate's money.  A constructive trust should be imposed "to prevent unjust enrichment by one who has an equitable duty to convey property to those to whom the property justly belongs," id. at 729, but there is no longer any property the Court can specifically identify as belonging to the bankruptcy estate.  A constructive trust in this case would be functionally equivalent to – and provide the Trustee with nothing greater than – a monetary judgment as described in Parts II(A) and II(C), above.  The Court concludes Count IX is unnecessary.

### F.  Count X

In Count X, the Trustee asks the Court to revoke Hassan's discharge.  A debtor's discharge should be revoked if requested by the Trustee and if the Court finds

> the debtor acquired property that is property of the estate, or became
> entitled to acquire property that would be property of the estate, and
> knowingly and fraudulently failed to report the acquisition of or entitlement
> to such property, or to deliver or surrender such property to the trustee;

11 U.S.C.A. § 727(d)(2).  The Court finds Hassan knowingly came into possession of property belonging to the bankruptcy estate -- the limousine business – and knowingly and fraudulently concealed its value from the Trustee.  Hassan's discussions with his bankruptcy attorney demonstrated Hassan knew not only that the business was an asset of the estate, but that an accurate statement of its value was important because the Trustee might sell the assets in order to satisfy the Hassans' debts.  Hassan did not disclose that he had tried to sell the business for $800,000.  He also did not disclose his continuing efforts to sell the business.  The very act of trying to sell the business demonstrated the falsity of his contemporaneous claim (on Schedule B) that the business had no value.  The Court rejects Hassan's effort to place the blame on Gay: Gay relied on the false information Hassan provided.  Hassan's alternative explanation is that the valuation of zero was true because the business was not making money. The Court believes Hassan understood the difference between a business's valuation as a going concern and the value of a business's assets, and that his failure to divulge

the latter was an intentional act designed to prevent the Trustee from further exploring the business's liquidation value.

Hassan knew the business belonged to the bankruptcy estate, and this is why he concealed his bankruptcy from Murphy and Moser.  When Moser discovered the bankruptcy, Hassan initially tried to convince Moser that the bankruptcy was irrelevant to their transaction.  When this failed to placate Moser, Hassan executed documents re-characterizing the transaction in an effort to evade the effects of his bankruptcy.  The Agreement was a sham, designed to further Hassan's efforts to sell property he knew belonged to the bankruptcy estate.

Hassan attempts to blame Murphy for this transaction.  Murphy settled with the Trustee, and while the Court harbors suspicions and beliefs about his involvement in this matter there is no legal justification for the Court to express them.  However, the Court notes that Murphy's advice played a small part in Hassan's efforts.  Hassan resolved to sell the business long before he met Murphy, and continued his subterfuge long after Murphy's role ended.  Thus, the Court's conclusion would not change even if Murphy advised Hassan the Agreement would "save" the transaction with Moser.

Hassan received over $300,000 for property that he knew did not belong to him. He did not report this fact to his bankruptcy attorney.  He did not report this fact to the Trustee.  Instead, he kept the money and used it for his own and others' purposes. When Moser "returned" the business to Hassan, Hassan met again with Murphy. Murphy arranged for Hassan to talk with Judge Norton.  Murphy explained the entire sequence of events to Judge Norton, and later Hassan did the same.  Judge Norton doubted the Agreement would serve as a valid contract for services, particularly in light of the prior Stock Purchase Agreement and the circumstances under which the Agreement was drafted.  Judge Norton expressed these doubts to Murphy.  She also expressed them to Hassan and advised him to discuss the matter with Gay because the matter needed to be disclosed to the Trustee.  Hassan did not follow this advice; instead, he presented Gay with a copy of the Agreement and made no mention of the Stock Purchase Agreement.  Hassan's concealment of the Stock Purchase Agreement was purposely calculated to keep Gay from divulging it to the Trustee because Hassan knew (from talking to Judge Norton) that the Stock Purchase Agreement would cause

Gay to question the true nature of the sale to Moser.  Hassan needed Gay's help to continue deceiving the Trustee, and for this reason he concealed the Stock Purchase Agreement from Gay.

The Court concludes Hassan embarked on a course of conduct designed to sell property he knew belonged to the bankruptcy estate and keep the proceeds for himself. The Court finds Hassan knew that his actions violated his obligations as a bankruptcy debtor, and he nonetheless endeavored to conceal them.  Thereafter, he has made no effort to return the property to the estate or otherwise make recompense.  The Court finds no reason *not* to revoke his discharge.  Accordingly, Ashraf Hassan's bankruptcy discharge is revoked.[10]

### G.  Attorney Fees and Costs

The automatic stay precludes "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  The prior discussion establishes the stay was violated.  In summary, Hassan knowingly violated the stay by selling assets of the estate and converting the money to his own uses.  IFC violated the stay by accepting the benefits of estate funds expended on its behalf; it did so knowingly because it is charged with the knowledge of its Co-President and director, Hassan.  Said and the other Said Companies are responsible for IFC's debts because the corporate veil does not protect them.

When the stay is willfully violated, the injured party may recover, *inter alia*, attorney fees.  Id. § 362(k)(1).  The bankruptcy estate was injured by the willful violation of the stay, so the estate is entitled to recover its attorney fees.

Based on the evidence offered at trial, the Court finds the Trustee incurred attorney fees and costs in the amount of $620,597.24, and that this expenditure was

---

[10]Lest there be any doubt, the Court expressly states that this ruling has no effect on Irina Hassan's bankruptcy discharge.

reasonable.[11]  The Court believes the amounts paid in settlement by Murphy and Lord should be applied to the total judgment in some way in order to prevent a double recovery.  The Trustee proposed the settlement proceeds be applied to the attorney fees and costs; none of the remaining Defendants addressed this issue, and the Court finds this proposal acceptable.  Accordingly, the Trustee is entitled to recover fees and costs totaling $335,597.24.[12]

The Court finds Hassan is responsible for the entire amount.  However, given the substantially smaller amount of the other Defendants' liability, the Court finds it inequitable to make Said and the Said Companies responsible for all of the Trustee's fees and costs.  The Said Companies are liable for approximately 6.7% of the damages, so the Said Companies will be jointly and severally liable for 6.7% of the Trustee's remaining fees, or $22,485.02.  Said is responsible for approximately 14.1% of the damages, so he is jointly and severally responsible for $47,319.21 in attorney fees.

H.  Interest

The Trustee seeks prejudgment interest on the amounts due.  Under Kansas law creditors are entitled to prejudgment interest under specified circumstances, several of which apply here.  K.S.A. § 16-201.  Defendants received the estate's money without its knowledge and used it for their (or others') purposes.  Defendants withheld money from the estate and have vexatiously refused to return it.  The taking of the money is regarded as a "forced loan" under the Bankruptcy Code, and prejudgment interest may be awarded "for money lent and money due on settlement of account, from the day of

---

[11]The Court notes that approximately one-third of this total has already been approved in orders issued by Judge Somers.

[12]At trial, the Court suggested the possibility of identifying those fees attributable solely to litigating against Murphy and whether those fees should be subtracted from any attorney's fees awarded.  The Court declines to make this adjustment because Murphy's settlement is being attributed to the fee and cost award and the amount he paid exceeded the sum attributable solely to him.  Murphy paid $250,000.  Essentially, then, approximately $108,000 is being applied to compensate for the attorney fees and costs attributable to him, and the remainder (approximately $142,000) is being applied to the fees and costs applicable to *all* of the Defendants.

liquidating the account and ascertaining the balance." The rate of interest specified by the statute is 10% per annum.

Hassan strenuously objected to the awarding of interest. In doing so he focused on the amount of time it has taken to bring this matter to a final judgment. Hassan's objections are rejected. Interest is not punishment: it represents the lost time value of money. By depriving the estate of its money, Hassan deprived the estate of the opportunity to earn interest on that money. The fact that the Kansas Legislature has deemed the appropriate amount of interest to be 10% does not justify ignoring it. Moreover, the delays are not attributable to the Trustee as Hassan suggests; some of the delay was attributable to motions filed by co-defendants, and some of the delay was attributable to the Court's calendar. Some of the delay was also attributable to Hassan: at any moment he could have returned the money that did not belong to him, diminished the time he deprived the bankruptcy estate of its property, and thereby diminished his obligation to pay interest. Hassan insinuates he does not have the money to repay the estate and thereby stop the accumulation of interest – but then, he had the money at the very moment he took it. Regardless, this is not a valid reason to give the estate less than a full recovery.

Taking into account the dates of Moser's payments to Hassan, and relying on Exhibit 78, the Court finds the interest due as of September 12, 2014, to be $307,559.92. Interest continued accruing from September 12 to the date of judgment at the rate of $82.30 daily, bringing Hassan's total interest obligation to $308,382.92.

Taking into account the dates of Hassan's payments on behalf of IFC, and relying on Exhibit 79, the Court finds the interest due on the payments to IFC as of September 12, 2014, to be $20,184.31. Interest continued accruing from September 12 to the date of judgment at the rate of $5.47 per day, bringing the total interest owed by IFC to $20,239.01. As they are alter egos of each other, all of the Said Companies are jointly and severally liable on this obligation as well.

Taking into account the dates of Hassan's payments to Said, and relying on Exhibit 79, the Court finds the interest due on the payments directly to Said as of September 12, 2014, to be $43,302.22. Interest continued accruing from September 12 to the date of judgment at the rate of $11.62 per day, bringing the total interest due on

the sums Said directly received to $43,418.42.  In addition, Said is jointly responsible for IFC's obligation.

## III.  CONCLUSION

In accordance with the foregoing discussion, the Court enters judgment on Counts I, II, IV, VIII(A) and VIII(B) as follows:

- Judgment against Ashraf Hassan in the amount of $944,400.16, which consists of:
    - the principal amount of $300,420
    - prejudgment interest in the amount of $308,382.92.
    - attorney fees and costs in the amount of $335,597.24.
- Judgment against the Said Companies – International Football Club, Inc. ("IFC"), Overland Park Sports Complex, LLC, Terra Sports Group, Terra Venture, Inc., Terra Venture Investments, LLC, and Analytical Management Laboratories, Inc. – in the amount of $62,724.03 which consists of:
    - the principal amount of $20,000
    - prejudgment interest in the amount of $20,239.01.
    - attorney fees and costs in the amount of $22,485.02.

The liability is joint and several amongst these entities, as well as with the other Defendants.  However, no more than $62,724.03 can be collected from the Said Companies, and any amounts collected from the Said Companies serves as a credit toward the amounts owed by Hassan and Said.

- Judgment against Bill Said in the amount of $133,237.63 which consists of:
    - the principal amount of $42,500
    - prejudgment interest in the amount of $43,418.42.
    - attorney fees and costs in the amount of $47,319.21.

Said's liability is joint and several with respect to the other Defendants.  However, no more than $133,237.63 can be collected from Said.  Said's obligation subsumes IFC's obligation, so as stated earlier any amounts collected from the Said Companies serves as a credit on his obligation.  In addition, any amounts collected from Said serve as a credit towards Hassan's obligation.

26

- Counts III, V, VI, and VII are dismissed.

- Count IX sees a remedy and is not a cause of action; no judgment is entered, and the requested remedy is denied.

- Judgment is entered in the Trustee's favor on Count X, and Ashraf Hassan's bankruptcy discharge is revoked.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: September 23, 2014          UNITED STATES DISTRICT COURT